## RECONSTRUCTION FINANCE CORP. v. LEONARD REFINERIES, Inc.

### Civ. A. No. 6860.

United States District Court
E. D. Michigan, S. D.
April 4, 1951.

C. B. Marks, Oswald C. Grattan and G. W. Lamphere, all of Detroit, Mich., for plaintiff.

David N. Mills and Cook, Beake, Miller, Wrock & Cross, all of Detroit, Mich., for defendant.

LEVIN, District Judge.

Plaintiff, Reconstruction Finance Corporation, a wholly owned United States Government corporation, as successor to Defense Supplies Corporation [1] brings this action for the return of an alleged excess subsidy payment to the defendant in the sum of Nine Thousand Sixty-Two Dollars ($9,062).

The facts have been stipulated. Certain refineries in Michigan, including defendant's refinery at Alma, Michigan, and in other midwestern states, have not at all times utilized their full productive capacities because the absence of facilities for shipping crude oil from the southern oil fields by pipe line or barge makes it impossible for them to meet the competition of refineries located along pipe-line or barge routes. The critical need for petroleum products during World War II prompted the Defense Supplies Corporation, pursuant to authority vested in it, to grant subsidies to refiners like the de-

fendant, to encourage the transporting of crude petroleum from distant sources to oil refineries located in the Midwest. The terms and conditions governing the payment of these subsidies are found in Regulation No. 5, issued April 20, 1944, by the Defense Supplies Corporation and published in the Federal Register. The amount of the subsidy was measured by the excess of the cost of transporting the oil by rail or barge over the cost of moving the oil by pipe line between the points of origin and destination, and the per barrel rates of subsidy for oil movements between specific points of origin and destination were listed in Schedule A of such Regulation.

The pertinent part of Schedule A reads: "The rates contained in this Schedule are based in part upon tank car tariff rates between the points listed which were in effect on April 10, 1944. In the event of any change in such tariff rates, Defense Supplies Corporation reserves the right to make corresponding adjustments in the rates listed above, effective from the date of tariff change."

The rate of subsidy for rail movements between Midland, Texas, and defendant's plant at Alma, Michigan, was established by this schedule at $1.059 per barrel. This rate of subsidy was based upon a published tariff as of April 10, 1944, of fifty cents (50¢) per hundred weight for rail shipments of crude petroleum between these points. Agent Peel's Southwestern Lines Tariff No. 133–G effective December 15, 1944, provided a rate for crude petroleum shipments between Midland and Alma, equal to 33¢ plus 17¢, bearing a reference mark "30", which was explained at the bottom of the page as "Basis—the Centralia, Illinois, combination." This 50¢ rate had been in effect for a number of years prior to the shipments involved in this action and had been applicable not only to crude petroleum shipped through Centralia but also to shipments from Midland

---

1. Defense Supplies Corporation, a subsidiary of the Reconstruction Finance Corporation, dissolved on July 1, 1945, pursuant to Public Law 109, 15 U.S.C.A. § 611 note, approved June 30, 1945, and its powers and duties transferred to Reconstruction Finance Corporation.

to Alma, moving over routes not through Centralia.

All of the crude petroleum involved in this action was shipped over routes to which the 50¢ rate had been applicable, although none of it had been shipped via Centralia, and the defendant paid the railroads for such shipments at the rate of 50¢ per cwt. The recipient of the subsidy under Regulation No. 5 was free to choose the route of movement, and the regulation did not provide that the amount of the subsidy would vary according to the route actually used.

From time to time the defendant filed claims against Defense Supplies Corporation and later with the plaintiff as its successor, and received payment of such claims pursuant to the regulation. Among such claims were defendant's claims Nos. 5, 6 and 7 for May, June and July, 1945, respectively, which were paid in full to the defendant.

Unbeknown to either of the parties herein, the rate for crude petroleum shipments between Midland and Centralia was reduced from 33¢ per cwt. to 29½¢ per cwt. by Agent Peel's Southwestern Lines Tariff No. 125–M Suppl. 97, Item 620c issued April 5, 1945, effective May 12, 1945. Reference "580" applicable to this change is as follows: "In compliance with and as a result of Order of the Interstate Commerce Commission in Docket No. 28760 of February 24, 1944, as amended. Issued under authority of Fourth Section Order No. 15152 of July 18, 1944, supplemented." This order required rail carriers to publish new non-discriminatory rates to apply to crude petroleum and certain petroleum products shipped between points in Texas and Illinois.

Accordingly, the 29½¢ rate from Midland to Centralia, added to the 17¢ rate from Centralia to Alma, made a sum of intermediates equal to 46½¢ per cwt., and from and after May 12, 1945, this 46½¢ per cwt. became the lawful rate for all shipments of crude petroleum moving from Midland to Alma via Centralia, since Section 4 of the Interstate Commerce Act, 49 U.S.C.A. § 4, makes unlawful any through rate in excess of the aggregate of intermediate rates between the points of shipment.

All the shipments with which we are concerned were made during the months of May, June and July, 1945, but none were made prior to May 12, 1945. As stipulated by the parties when these shipments were made and at the time of the payment of defendant's claims, neither defendant nor plaintiff's predecessor, Defense Supplies Corporation, knew that the published through rate of 50¢ per cwt. was not the lawful rate for shipments of crude petroleum from Midland to Alma via Centralia, nor did they know that there was a difference between the then lawful rates between these points via Centralia and via the routes of actual movement.

Plaintiff notified defendant by letter dated October 29, 1945, that the rate of subsidy per barrel payable under the Revised Schedule with respect to movements between Midland and Alma was reduced with respect to all shipments originating on and after May 12, 1945. The letter, which was the first information the defendant received of the difference in rates, indicated the reduction of the rate via Centralia from 50¢ per cwt. to 46½¢ per cwt., and advised the defendant that plaintiff had determined that the defendant had been overpaid a total of Nine Thousand Sixty-Two Dollars ($9,062).

The old rate of 50¢ (containing a reference at the bottom of the rate page indicating that it was based on the "Centralia, Illinois Combination") was again published as the through rate between Midland and Alma in a published tariff, effective February 14, 1946, such rate purporting to apply to shipments both via Centralia and via certain other established routes, including those over which the shipments in question had moved. The rate of 29½¢ plus 17¢ or a total of 46½¢ was for the first time published as the through rate between Midland and Alma, on July 6, 1946, effective August 5, 1946, more than a year after the shipments in question, and was applicable both to movements via Centralia and via other established routes, including those over which the shipments in question had actually moved.

Plaintiff advised defendant on February 19, 1946, and again on May 29, 1946, to seek a refund from the railroads in question, stating that in plaintiff's opinion the carriers would be willing to make a refund on the informal docket through the Interstate Commerce Commission. Defendant accordingly sought reparation on application of the Texas and Pacific Railway Company before the Central Freight Association Traffic Commerce Committee, and on application of the Texas and Pacific Railway Company before the Southwestern Lines Traffic Commerce Committee, but both claims were denied by the Committee for the reason that the shipments in question did not move via Centralia.

It is the plaintiff's contention that in interpreting Schedule A of the regulation, the phrase "any change in such tariff rates" empowers it to make reductions in the subsidy payments retroactive to May 12, 1945, at which time the tariff rate between Midland and Centralia was reduced. I am of the view that the phrase "any change in such tariff rates" modifies and has reference to "tariff rates between the points listed" in the prior sentence. The applicable points listed in Schedule A of the regulation are Midland and Alma, and not Midland to Centralia and Centralia to Alma. The defendant was making a through shipment, not an intermediate one. It would seem that the proper interpretation of the word "tariff" used but not defined in the regulation, is the "published" tariff.

The defendant, until August 5, 1946, would have been obliged to pay the published rate of 50¢ per cwt. for a through shipment even if it had chosen the Centralia routing, and this is so notwithstanding that it is unlawful for a through rate to be in excess of the aggregate of intermediate rates between points in question. Said Mr. Justice Brandeis speaking for the court in Keogh v. Chicago and Northwestern Railway Company, 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183: "The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." See also Lowden, Trustees v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953 and Norfolk & Western R. Co. v. American Compressed Steel Corp., 6 Cir., 181 F.2d 183.

The plaintiff contends that the defendant agreed to the refund by delivering the following form of receipt for all sums received in payment of the claims Nos. 5, 6 and 7: "The undersigned acknowledges receipt of the amount shown above. If upon subsequent audit or examination by Reconstruction Finance Corporation of the books of the undersigned, Reconstruction Finance Corporation, determines that the amount paid herewith is in excess of the total amount due, the undersigned agrees to return such excess amount to Reconstruction Finance Corporation upon its demand."

It is not claimed that the defendant has failed to comply with any of the provisions of the regulation or that its books and records contain any errors or inaccuracies. There is nothing in the receipt which spells out the liability here sought.

This is not a case where one subsidized chose a more expensive route than the one scheduled and seeks to fix the cost of his extravagance or negligence upon the public. Plaintiff is empowered to determine whether the claimant comes within the purview of the regulation and entitled to the payment of the subsidy, and it also has the right to determine whether the computation is correct. It did, in fact, determine that the defendant was entitled to the payment of the subsidy in the amount paid, and the controversy now is a solely legal one. I am of the opinion that the defendant's rights under the terms of its contract with the Defense Supplies Corporation, as expressed in Regulation 5, were measured by the rate set forth in the published tariff rather than the unpublished one.

A judgment may be entered for the defendant.